**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

LAWRENCE JEFFERY PIAZZA                                              PLAINTIFF

V.                              CASE NO. 5:15-CV-05115

ZOETIS, INC.                                                        DEFENDANT

<u>**MEMORANDUM OPINION AND ORDER**</u>

Now pending before the Court is a Motion for Summary Judgment (Doc. 18) filed by Defendant Zoetis, Inc. Plaintiff Lawrence Jeffery Piazza, and Zoetis, have fully briefed the Motion, making it ripe for adjudication. For the reasons stated herein, the Motion is **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND

This is a Fair Labor Standards Act ("FLSA") case in which a technician whose job was to service poultry vaccination machines contends that he should have been paid overtime wages for the hours he spent "on call." Lawrence Jeffrey Piazza was hired as a field service technician ("FST") by a company called Embrex, Inc. on December 11, 2006. Shortly thereafter, Embrex was acquired by Pfizer, Inc., which in 2013 spun the former Embrex business off into a new entity called Zoetis, Inc. Throughout this time, the companies' line of business remained substantially the same. Zoetis and its predecessors developed animal vaccines and machines to efficiently administer those vaccines. Piazza received several promotions, but his basic job responsibilities remained the same until he resigned in March of 2015.

As an FST, Piazza's job was to install and service vaccine administering devices at certain poultry plants in Arkansas, Missouri, Oklahoma, and Washington State.

Piazza and other FSTs maintained home offices, and filled their forty-hour workweeks by performing certain duties at home, and travelling to their assigned hatcheries to service Zoetis's devices in the field. On occasion, Piazza was also required to go to Zoetis's office in Springdale, Arkansas, to retrieve needed parts for the devices, or to perform other job functions. Piazza does not dispute that he was paid appropriately for all of the hours worked during his regular 40-hour workweek.

In addition to making FSTs available to their customers during the regular 40-hour workweek, Zoetis and its predecessors required FSTs to remain on call around the clock, in case their assigned hatcheries had problems operating the vaccine-administering devices at nights and on weekends. When problems with the devices arose during these on-call hours, the hatcheries' employees would call the FST's cellphone for assistance. The FST was then required to troubleshoot the problem over the phone, and if it could not be resolved, travel to the hatchery to fix the issue in person. The parties agree that an on-call rotation was implemented in February of 2014, whereby only one FST in the Arkansas region was assigned to be on call per weekend. Several other aspects of Zoetis's on-call policy, however, remain in dispute. These include the number of customer calls received by Piazza during his on-call hours; the amount of time Piazza had to respond to such calls; and how difficult it was for Piazza to get other FSTs to cover his on-call time, such that he could take the time completely off.

During these on-call hours, Piazza was compensated at a "time and a half" rate when he reported troubleshooting customers' problems over the phone, or travelling to

their hatcheries. However, he was not compensated for the time he spent while on call but not actively responding to customers' phone calls.

Piazza filed a Complaint (Doc. 1) in this Court on May 20, 2015, asserting that Zoetis's failure to pay him for time spent on call but not actively responding to customers' phone calls violates the FLSA and the Arkansas Minimum Wage Act ("AMWA"). The Complaint also alleges that Zoetis retaliated against Piazza after he began asking questions about the on-call policy, in violation of the FLSA. Zoetis generally denied the claims against it in an Answer (Doc. 10) filed on September 4, 2015, and then filed the instant Motion for Summary Judgment (Doc. 18) on August 12, 2016. Piazza filed his Response (Doc. 22) on August 31, 2016, and Zoetis filed a Reply (Doc. 24) on September 7, 2016. The Motion now being ripe for decision, the Court finds that it should be granted in part and denied in part for the reasons discussed below.

## II.     SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts. *Union Elec. Co.*, 135 F.3d at 1212-13. The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). If the moving party meets this burden, then the non-

moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

### III.    DISCUSSION

### A.    The FLSA: A Practical Approach

The FLSA, 29 U.S.C. § 201 *et seq.*, commands that, with certain exceptions not germane to this case,

> no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).[1] This time-and-a-half requirement only applies to time the employee spends *working* in excess of forty hours per week. *See* 29 U.S.C. § 203(g)

---

[1] The AMWA includes a materially identical provision, Ark. Code Ann. § 11-4-211(a), and so the Court will analyze Piazza's AMWA claim together with his FLSA claim. *See Carter v. Primary Home Care of Hot Springs, Inc.*, 2015 WL 11120563, at *2 (W.D. Ark. May 14, 2015) ("The FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner." (collecting cases)); *Ark. Dep't of Veterans Affairs v. Okeke*, 2015 Ark. 275, at

("'Employ' includes to suffer or permit to work."). The Act, however, "does not define when an employee is *working* for his or her employer." *Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 725 (8th Cir. 2001) (emphasis added). As a result, the burden to "develop general criteria for deciding when an employee is working for the purposes of the FLSA," has fallen "largely on the federal courts, as well as the Department of Labor." *Id.* This problem has been especially prevalent in cases involving the on-call policies of employers.

A pair of cases decided by the Supreme Court on the same day in 1944 form the foundation of federal courts' jurisprudence on this issue. Both *Armour & Co. v. Wantock*, 323 U.S. 126 (1944), and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), involved plaintiffs employed as fire fighters by private companies. *Armour*, 323 U.S. at 127; *Skidmore*, 323 U.S. at 135. After the plaintiffs in both cases finished their regular working shifts, they were required to remain on site for a number of hours, in case a fire emergency occurred. *Armour,* 323 U.S. at 127-28; *Skidmore*, 323 U.S. at 135-36. Accordingly, they stayed in living quarters built on the companies' respective facilities several nights per week. *Id.* They were not compensated for their time spent on call, unless they were called to perform some task. *Id.* This arrangement, they argued, violated the FLSA's overtime rule.

The Supreme Court found that time spent waiting for an event to occur—on-call time—could constitute work, and thus be subject to compensation under the FLSA. *Armour*, 323 U.S. at 133 ("Of course an employer, if he chooses, may hire a man to do

---

*6 (stating, in the context of an overtime compensation case, that "[t]he AMWA appears to impose the same overtime requirements as the FLSA").

nothing, or to do nothing but wait for something to happen."); *Skidmore*, 323 U.S. at 136 ("[N]o principle of law found either in the statute or in Court decisions precludes waiting time from also being working time."). Whether on-call time is compensable depends on whether an employee was "engaged to wait," and thus entitled to wages under the FLSA, or was "wait[ing] to be engaged," and thus not so entitled. *Skidmore*, 323 U.S. at 136-37. The difference, in other words, lies in "[w]hether [the employee's] time is spent predominantly for the employer's benefit or for the employee's . . . ." *Armour*, 323 U.S. at 133. This is necessarily a fact-intensive inquiry, "dependent upon all the circumstances of the case." *Id.*

Courts in the Eighth Circuit applying *Armour's* and *Skidmore's* fact-intensive standard have looked to a variety of factors to determine whether on-call time is compensable under the FLSA. This includes (i) the geographic area an employee is limited to while on call; (ii) the amount of time the employee has to respond to calls; (iii) the frequency with which an employee is called; (iv) the amount of flexibility the employee has in selecting on-call shifts; and (v) the employee's ability to engage in personal activities while on call. Thus, the Eighth Circuit has found that nurses required to be reachable by phone or beeper who had to report to the hospital within 20 minutes, were typically not called into work more than once per shift, and could "pursue a virtually unlimited range of activities in town or at home," were not entitled to overtime wages for their on-call time. *Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 725 (8th Cir. 2001). On the other hand, forest rangers subject to call 24 hours per day, seven days a week who were limited to a 50-mile radius, required to monitor all radio communications for emergencies, respond within 30 minutes, and depart for an emergency immediately

6

thereafter, were entitled to overtime wages for their on-call time. *Cross v. Ark. Forestry Comm'n*, 938 F.2d 912 (8th Cir. 1991).

On the district court level, the Southern District of Iowa found that part-time EMTs who could choose their on-call shifts, were required to wear a pager, respond to a station—in full uniform—within five minutes, and were called on approximately 50% of their shifts[2] were not spending their on-call time predominantly for their employer's benefit. *Dickhaut v. Madison Cnty., Iowa*, 707 F. Supp. 2d 883 (S.D. Iowa 2009). When employees were on call 24/7, had to be within a "reasonable proximity" to work, and were apparently called in with some frequency,[3] the Eastern District of Arkansas found genuine issues of material fact about whether the FLSA applied to the on-call time. *Watson v. Surf-Frac Wellhead Equip. Co., Inc.*, 2013 WL 5524122, at *3 (E.D. Ark. Oct. 3, 2013).

Rather than revealing a precise formula or metric upon which this Court can rely to adjudicate the instant Motion, the aforementioned cases illustrate the importance of applying a "practical approach based on the realities of [the] case." *Reimer*, 258 F.3d at 726 (quoting *Armour*, 323 U.S. at 133). Applying such an approach, the Court finds that the several unresolved questions of fact in this case, when viewed in the light most favorable to Piazza, could allow a jury to conclude that his on-call time was spent predominately for the benefit of Zoetis.

---

[2] To be more specific, one of the plaintiffs was called in on 45% of his shifts and the other was called 61% of the time. 707 F. Supp. 2d at 886.

[3] The *Watson* Court did not specify the frequency with which the employees were called in to work, but stated that "the frequency with which they were required to respond to calls," along with the amount of time they were required to be on call, may prove that they were "engaged to wait, not that they waited to be engaged." 2013 WL 5524122, at *4.

### B.     Questions of Fact

First, a question of fact remains as to the frequency with which Piazza was called by customers during his on-call shifts. Zoetis has offered the affidavit of Reina Maston, a Senior Human Resources Associate for Zoetis who attached approximately two years of Piazza's time records to her sworn testimony. (Docs. 20-2, 20-3, 20-4). Per Maston's summary of those time records, Piazza reported working more than 40 hours in 25 of 91.57 total weeks—about 27% of the time. (Doc. 20-2, p. 3). He reported working on 23 out of 182 Saturdays and Sundays during the same time period—slightly less than 13% of the time. *Id.* Similarly, Zoetis has included the affidavit of its Director of Field Service, Roger Chisum. (Doc. 20-10). The Chisum affidavit attaches Piazza's records from Zoetis's "JD Edwards database," which he describes as tracking the work performed by FSTs while on call. (Docs. 20-10, 20-11). According to that database, Piazza fielded 85 phone calls and made 17 field visits to hatcheries from 2012 until his resignation in March of 2015. *Id.*

While these figures, and others provided in Maston's affidavit, suggest that Piazza spent most of his on-call time for his own benefit, Piazza has brought the reliability of the time records into question. Specifically, Piazza offers his own affidavit and that of Paul Warner Green, an FST employed by Zoetis from 2009 to 2016. (Docs. 23-1, 23-2). Piazza's affidavit declares that he received "as many as 15-20 trouble calls a week in some weeks," and that FSTs "often did not record all of [their] trouble calls." (Doc. 23-1, ¶ 5). This was so because, at times, Zoetis "didn't have a good system to record trouble calls," and "our supervisors discouraged us from reporting the overtime we spent on trouble calls that we received." *Id.* Greene's affidavit largely echoes

Piazza's, except that he estimates receiving as many as 10 trouble calls per week. (Doc. 23-2).

Piazza's deposition transcript elaborates on what he perceived as Zoetis' policy of discouraging overtime. After describing the range in volume of calls he would receive per week, Piazza responded affirmatively to the question of whether he would have been "possibly in trouble with [his] supervisors if [he was] reporting too many trouble calls." (Doc. 23-6, p. 126). He also claimed to have received phone calls "chewing [him] out" on Monday mornings if he reported trouble calls over the weekends. *Id.* at 129-130. And, on cross examination, he confessed to not reporting all of his trouble calls because he "didn't want to feel like [he] was getting in trouble every time" he reported calls. *Id.* at 156.[4]

Zoetis Senior Territory Manager James Greenlee's deposition also brings the accuracy of the time records into question. Greenlee agreed that "for lots of [FSTs], . . . every single trouble call" was "probably not" documented. (Doc. 23-3, p. 53). This was so because reporting calls was "a hassle." *Id.* At the time, Zoetis had "multiple systems," such that FSTs "were having to enter time" in more than one, and "it gets kind of redundant." *Id.* Because of this process, short conversations over the phone, Greenlee testified, were "probably not, all the time" reported. *Id.* at 53-54.

With respect to the JD Edwards database, that system was used to record orders for new parts. (Doc. 23-3, p. 25). If a trouble call did not require ordering a part, it would not have been recorded in that system. (Doc. 23-2, ¶ 7). Accordingly, there is a factual

---

[4] While Piazza admitted that not reporting all of his trouble calls was his own decision, and was a violation of Zoetis's policy, these admissions are tangential, at best, to the focus of the Court's analysis; namely, determining the frequency with which Piazza was called during his on-call time, in the light most favorable to him.

dispute about the database's accuracy as an indicator for the frequency of calls received by Piazza.

A second question of fact exists regarding the time Piazza had to respond to calls from customers he received while on call. The parties agree that in late 2014, Zoetis told Piazza that his required response time was 30 minutes. Prior to that time, however, the parties characterize Piazza's required response time differently.[5] Zoetis contends that when it told Piazza his response time was 30 minutes, it "was not a change in policy." (Doc. 24, p. 3). Instead, the 30-minute figure came in response to Piazza's insistence on establishing "a hard-and-fast number." *Id.* The expectation before and after, however, was always that the FSTs would "answer customers' calls when they heard or saw their cell phone was ringing, and if they missed a customer['s] call, that they would return it as soon as possible." *Id.* Zoetis relies on Greenlee's deposition, and the deposition of former Zoetis Territory Manager Dean Allen, both of which accurately reflect its description of the on-call policy's timing requirements. *See* Doc. 23-3, pp. 29-32; Doc. 23-4, pp. 36-39, 54-56.

---

[5] As somewhat of an aside, Zoetis argues that because Piazza's Complaint states his response time was 30 minutes, he cannot now argue it was less than that. *See* Doc. 1, ¶ 14; Doc. 20, ¶ 12. While Zoetis is correct that "admissions in the pleadings are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended," *Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990) (alterations and quotation omitted), Piazza argues that the point is moot because he will "promptly file a motion for leave to amend the complaint" to clarify his allegation and conforming the pleading to the evidence. (Doc. 22, pp. 5-6). For purposes of judicial economy, and specifically to avoid requiring the parties to re-file their summary judgment briefings, the Court will interpret Piazza's statement as a motion for leave to amend his Complaint for the limited purpose of clarifying the aforementioned allegation and conforming the pleadings to the evidence. The Court will now **GRANT** that motion, and require Piazza to file an amended complaint within **10 DAYS** from the entry of this Order. Zoetis will then have **10 DAYS** to file an amended answer.

The affidavits of Piazza and Greene, on the other hand, characterize their required response time as being "immediately." (Doc. 23-1, ¶ 3; Doc. 23-2, ¶ 3). As Piazza explained in his deposition, there was "no slack in not responding," because if the hatcheries didn't get a response "within the first five [or] ten minutes," they would call Zoetis's service center in North Carolina directly. (Doc. 23-6, p. 123).

Third, Piazza has raised a question of fact about his ability to get on-call time covered by another FST. The parties agree that once the on-call rotation was implemented in February of 2014, Piazza was only on call during weekends when it was his turn in the rotation. The parties have different views, however, on how easy it would have been for him to get coverage for on-call shifts during the week, and during the pre-rotation weekends. Zoetis argues that Piazza did not "recall asking a co-worker to cover a customer request while on-call, but acknowledges that he was allowed to do so." (Doc. 20, p. 4). According to Zoetis, then, Piazza would have no basis for knowing whether other Zoetis employees would have been willing to cover his on-call shifts, because he never asked.

Piazza's affidavit, though, declares that there was "no flexibility within my on-call scheduling as all other [FSTs] were reluctant to provide coverage as they were covering their own areas." (Doc. 23-1, ¶ 7). Greene's affidavit again echoes Piazza's and further elaborates on the problem of finding coverage for on-call shifts: "Even if another FST had agreed to cover my hatcheries for on-call times, the operators at my assigned customers would have called my cell phone anyway. My assigned hatcheries had my cell phone number posted near the machinery, but they didn't have any other FST's

number." (Doc. 23-2, ¶ 8). These affidavits suggest that obtaining coverage for on-call shifts would have been quite difficult.

Finally, this case involves a question of fact about the extent to which Piazza was able to engage in activities for his own benefit while on call. Zoetis contends that Piazza engaged in a range of personal activities while on call, including attending movies, concerts and sporting events, his daughter's plays, performances, and recitals, and working on his farm. *See* Doc. 20, ¶ 10 (listing activities and citing to Piazza's deposition).

However, taking a closer look at Piazza's deposition, his answers about being able to perform most of those activities are not so clear cut. Piazza waffled on being able to attend movies while he was on call, stating "yes and no," as to whether he could, because of the risk of being interrupted. (Doc. 23-6, pp. 89-90). He then gave conflicting answers as to whether he had, in fact, attended any movies while not on vacation between 2006 and 2014. *Id.* at 90. Piazza admitted that he could go "pond fishing" at the pond around his house, but said he used to fish in lakes but could no longer do that. *Id.* at 90-91. The same was true, according to Piazza, with regards to hunting. He had received work calls before while sitting in a hunting stand by his house, but did not go hunting elsewhere because of the lack of cell phone coverage. *Id.* at 91-92. Piazza did admit to attending his daughter's events, but also said that during the events he remembers having to leave her school concerts to take customer calls in the lobby. *Id.* at 92-93. Finally, Piazza "occasionally attempted to do work on the farm at [his] home, but because of the on-call restrictions [he] was forced to hire laborers" to perform the work. (Doc. 23-1, ¶ 8).

Perhaps Piazza was justified in feeling that reporting overtime would get him in trouble. Perhaps he was justified in declining to report all of his trouble calls due to the complexity of the reporting system. Perhaps he received many more calls than Zoetis's databases captured. Perhaps Piazza's response time was incredibly stringent. Perhaps obtaining coverage for his on-call shifts was impossible. Perhaps his personal activities were severely impaired by frequent phone calls.

Or, perhaps not. The answers go to the credibility of witnesses, and are not for the Court to decide on summary judgment. Rather, the pertinent query is whether this case involves questions of material fact, such that a jury could return a verdict in Piazza's favor. Were there only one or two questions of fact about the issues discussed above, the Court would likely find that the questions were not material in nature; that is, resolving them in Piazza's favor would not allow a reasonable jury to return a verdict for him. However, this case involves several questions of fact. The number of calls received by Piazza, the time he had to respond to the calls, his ability to obtain coverage for his on-call time, and the extent to which he could perform personal activities while on call, are in all dispute. Add to these disagreements the around-the-clock nature of Piazza's on-call time, at least prior to the implementation of the on-call rotation, and—resolving these disagreements in the light most favorable to Piazza—a reasonable jury could return a verdict in his favor.

To be clear, the Court views the question of whether this case should survive summary judgment as particularly close. Even resolving all of the aforementioned questions of fact in Piazza's favor, reasonable minds could differ on whether a jury could find in his favor. Given the many unresolved questions of fact, the Court will allow

the case to proceed to trial, but it will pay careful attention to the sufficiency of Plaintiff's evidence before allowing the case to be submitted to a jury.

### C.     Piazza's Retaliation Claim

In addition to Piazza's claim that his on-call time was compensable under the FLSA, he also argues that Zoetis violated the FLSA by retaliating against him after he began asking questions about their on-call policy. The FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3). Claims of retaliation under the FLSA are subject to the *McDonnell Douglas* burden-shifting framework. *See Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff must first establish a *prima facie* case of retaliation by "showing that he participated in a statutorily protected activity, that [the defendant] took an adverse employment action against him, and that there was a causal connection between them." *Grey*, 396 F.3d at 1034-35. If the plaintiff can establish a *prima facie* case, the defendant must "articulate[] legitimate, non-retaliatory reasons for [the plaintiff's] discharge." *Id.* at 1035. Then, the plaintiff has the burden to show that "the legitimate, non-retaliatory reasons articulated by appellees were not the true reasons for discharge, but merely a pretext for retaliation." *Id.*; *see generally McDonnell Douglas*, 411 U.S. at 802-04. "In the summary judgment context, the issue [is] whether the evidence [is] sufficient to create a genuine issue of material fact on the question whether [the defendant] discharged [the plaintiff] in retaliation" for actions protected by the FLSA. *Grey*, 396 F.3d at 1035.

14

The Court finds that there is no genuine issue of material fact, and Piazza's retaliation claim cannot survive summary judgment. First, Piazza has not established a *prima facie* case of retaliation. The FLSA protects employees against retaliation for filing complaints or instituting proceedings against their employers. 29 U.S.C. § 215(a)(3). While § 215(a)(3) can be interpreted to cover a somewhat broader range of conduct than the literal meaning of its text suggests, *see Fezard v. United Cerebral Palsy of Cent. Ark.*, 809 F.3d 1006, 1012 (8th Cir. 2016) (finding that § 215(a)(3) protects employees whose employers mistakenly believed they reported FLSA violations to authorities), Piazza argues only that he was retaliated against for asking questions about Zoetis's overtime policy. Nowhere does he provide evidence that he reported, threatened to report, or even alleged any violations of the FLSA prior to Zoetis's supposedly adverse employment actions. Thus, the Court does not believe that Piazza engaged in activity protected by the FLSA prior to his resignation.

Even assuming, *arguendo*, that Piazza's conduct was protected activity, and even assuming that he could satisfy the other prongs of the *prima facie* requirement, Zoetis has offered legitimate non-retaliatory reasons for its actions, and Piazza has not shown them to be pretext. The adverse actions, according to Piazza, are that he was assigned to two hatcheries in Oklahoma and was made to perform menial tasks for two weeks in Zoetis's Springdale office. *See* Doc. 22, p. 17. However, Piazza's assignment to the hatcheries came after fellow FST Tucker Beilman was transferred to another position. (Doc. 23-4, pp. 116-17). Before Zoetis could fill Beilman's position, it divided his assigned hatcheries among the other FSTs in the region. *Id.* at 154. Piazza was assigned to two of Beilman's former hatcheries in Oklahoma for a period of two months,

as a result. *Id.* Piazza has offered no evidence to rebut this non-retaliatory justification for his assignment.

As to performing menial tasks in Zoetis's Springdale office for a couple of weeks, Dean Allen explained that "[a]ll the [FSTs] in their schedules have what we call open weeks . . . ." (Doc. 23-4, p. 155). Open weeks, he continued, are weeks when the Zoetis equipment at the FST's assigned hatcheries are not running. *Id.* FSTs were expected to schedule their vacation times around these open weeks, but if they did not, they could be called into the office to perform and be paid for 40 hours of work. *Id.* When Allen "asked Jeff [Piazza] about his open weeks, he had nothing to do. . . . and so [Allen] . . . had him come to the Arkansas office, like all other [FSTs] do . . . so they could get in their 40 hours." *Id.* Piazza has offered nothing that undermines this non-retaliatory justification.

In sum, Piazza's retaliation claim fails because he cannot establish a *prima facie* case of retaliation. Even if he could, and even if Zoetis's alleged conduct constituted adverse employment actions, his claim would still fail. Zoetis has offered legitimate non-retaliatory reasons for temporarily assigning Piazza to two hatcheries in Oklahoma and making him perform menial tasks at Zoetis's Springdale office for a couple of weeks. Piazza has not shown that those reasons were pretext.

## IV.   CONCLUSION

For the reasons stated herein, Zoetis's Motion for Summary Judgment (Doc. 18) is **GRANTED IN PART AND DENIED IN PART**. Piazza's FLSA and AMWA overtime compensation claims remain for trial, but his FLSA retaliation claim is **DISMISSED WITH PREJUDICE**. Additionally, Piazza shall file an amended complaint within **10**

**DAYS** of this Order's entry, and Zoetis shall have **10 DAYS** thereafter to file an amended answer.

     **IT IS SO ORDERED** on this _12th_ day of October, 2016.

                             TIMOTHY L. BROOKS
                             UNITED STATES DISTRICT JUDGE

17